**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

U.S. DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA
FILED    SEP 2 6 2019
CLERK

**INDICTMENT FOR**
**CONSPIRACY TO COMMIT HEALTH CARE FRAUD AND WIRE FRAUD,**
**HEALTH CARE FRAUD, CONSPIRACY TO DEFRAUD THE UNITED STATES**
**AND TO PAY AND RECEIVE HEALTH CARE KICKBACKS,**
**PAYMENT AND RECEIPT OF HEALTH CARE KICKBACKS,**
**AND NOTICE OF FORFEITURE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 19-120-JWD-RLB |
| | : | |
| *versus* | : | 18 U.S.C. § 1349 |
| | : | 18 U.S.C. § 1347 |
| KEVIN BERNARD HANLEY and | : | 18 U.S.C. § 371 |
| MARK THOMAS ALLEN | : | 18 U.S.C. § 2 |
| | : | 42 U.S.C. § 1320a-7b(b)(2) |
| | : | 42 U.S.C. § 1320a-7b(b)(1) |
| | : | 18 U.S.C. § 982(a)(7) |
| | : | 21 U.S.C. § 853(p) |

**THE GRAND JURY CHARGES:**

**BACKGROUND**

**The Medicare Program**

1.     The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled.  The benefits available under Medicare were governed by federal statutes and regulations.  The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare.  Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

2.      Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b) and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

3.      Medicare covered different types of benefits, which were separated into different program "parts." Medicare "Part A" covered health services provided by hospitals, skilled nursing facilities, hospices, and home health agencies. Medicare "Part B" was a medical insurance program that covered, among other things, medical services provided by physicians, medical clinics, laboratories, and other qualified health care providers, such as office visits, minor surgical procedures, and laboratory testing, that were medically necessary and ordered by licensed medical doctors or other qualified health care providers. The Medicare Advantage Program, formerly known as "Part C" or "Medicare+Choice," is described in further detail below.

4.      Physicians, clinics, and other health care providers, including laboratories (collectively, "providers") that provided services to beneficiaries were able to apply for and obtain a "provider number." Providers that received a Medicare provider number were able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

5.      When seeking reimbursement from Medicare for provided benefits, services, or items, providers submitted the cost of the benefit, service, or item provided together with a description and the appropriate "procedure code," as set forth in the Current Procedural Terminology ("CPT") Manual or the Healthcare Common Procedure Coding System ("HCPCS"). Additionally, claims submitted to Medicare seeking reimbursement were required to include: (a) the beneficiary's name and Health Insurance Claim Number ("HICN"); (b) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and

(c) the name of the provider, as well as the provider's unique identifying number, known either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI"). Claims seeking reimbursement from Medicare could be submitted in hard copy or electronically.

## Medicare Part B

6.      Medicare, in receiving and adjudicating claims, acted through fiscal intermediaries called Medicare administrative contractors ("MACs"), which were statutory agents of CMS for Medicare Part B. The MACs were private entities that reviewed claims and made payments to providers for services rendered to beneficiaries. The MACs were responsible for processing Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered service.

7.      Novitas Solutions Inc. ("Novitas") was the MAC for consolidated Medicare jurisdictions JH and JL, which included Louisiana, Mississippi, Oklahoma, Texas, and Pennsylvania. Regardless of where services were provided within jurisdictions JH and JL, Novitas received and adjudicated claims in, and paid claims from, Mechanicsburg, Pennsylvania. Claims submitted electronically from providers in Louisiana to Novitas necessarily traveled in interstate commerce.

8.      To receive Medicare reimbursement, providers needed to have applied to the MAC and executed a written provider agreement. The Medicare provider enrollment application, CMS Form 855B, was required to be signed by an authorized representative of the provider. CMS Form 855B contained a certification that stated:

> I agree to abide by the Medicare laws, regulations, and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the

> Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

9.      In executing CMS Form 855B, providers further certified that they "w[ould] not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and w[ould] not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

10.     Payments under Medicare Part B were often made directly to the providers rather than to the patient or beneficiaries. For this to occur, beneficiaries would assign the right of payment to providers. Once such an assignment took place, providers would assume the responsibility for submitting claims to, and receiving payments from, Medicare.

## Medicare Advantage Program

11.     The Medicare Advantage Program, formerly known as "Part C" or "Medicare+Choice," provided beneficiaries with the option to receive their Medicare benefits through a wide variety of private managed care plans, including health maintenance organizations ("HMOs"), provider sponsored organizations ("PSOs"), preferred provider organizations ("PPOs"), and private fee-for-service plans ("PFFS") (collectively, "Medicare Advantage Plans"), rather than through Medicare Parts A and B.

12.     Private health insurance companies offering Medicare Advantage Plans were required to provide beneficiaries with the same services and supplies offered under Medicare Parts A and B. To be eligible to enroll in a Medicare Advantage Plan, a person had to have been entitled to receive benefits under Medicare Part A and Part B.

13.     A number of private health insurance companies, including UnitedHealth Group, Inc. ("UnitedHealth"), Humana Inc. ("Humana"), WellCare Health Plans, Inc. ("WellCare"), and CVS Health Corporation ("CVS Health"), along with their related subsidiaries and affiliates, contracted with CMS to provide managed care to beneficiaries through various Medicare Advantage Plans.

14.     UnitedHealth, Humana, WellCare, and CVS Health were "health care benefit programs," as defined by Title 18, United States Code, Section 24(b).

15.     These health insurance companies, through their respective Medicare Advantage Plans, adjudicated claims in locations throughout the United States, specifically outside the state of Louisiana, and often made payments directly to providers, rather than to the beneficiaries that received the health care benefits, items, and services. This occurred when the provider accepted assignment of the right to payment from the beneficiary.

16.     To obtain payment for services or treatment provided to beneficiaries enrolled in Medicare Advantage Plans, providers had to submit itemized claim forms to the beneficiary's Medicare Advantage Plan. The claim forms were typically submitted electronically via the internet. The claim form required certain important information, including the information described above in paragraph 5 of the Indictment.

17.     When providers submitted claim forms to Medicare Advantage Plans, the providers certified that the contents of the forms were true, correct, complete, and that the forms were prepared in compliance with the laws and regulations governing Medicare. Providers also certified that the services being billed were medically necessary and were in fact provided as billed.

18.    The private health insurance companies offering Medicare Advantage Plans were paid a fixed rate per beneficiary per month by Medicare, regardless of the actual number or type of services the beneficiary received.    These payments by Medicare to the health insurance companies were known as "capitation" payments.    Thus, every month, CMS paid the health insurance companies a pre-determined amount for each beneficiary who was enrolled in a Medicare Advantage Plan, regardless of whether the beneficiary utilized the plan's services that month.    CMS determined the per-beneficiary capitation amount using actuarial tables, based on a variety of factors, including the beneficiary's age, sex, severity of illness, and county of residence.    CMS adjusted the capitation rates annually, taking into account each patient's previous complaints, diagnoses, and treatments.    Beneficiaries with more illnesses or more serious conditions would rate a higher capitation payment than healthier beneficiaries.

### Cancer Genetic Tests

19.    Cancer genetic testing ("CGx testing") used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future.    CGx testing was not a method of diagnosing whether an individual had cancer at the time of the test.

20.    Medicare did not cover diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." Title 42, United States Code, Section 1395y(a)(1)(A).    Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury." Title 42, Code of Federal Regulations, Section 411.15(a)(1).    Among the statutory exceptions

Medicare covered were cancer screening tests such as "screening mammography, colorectal cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests." *Id.*

21.    If diagnostic testing was necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing. Title 42, Code of Federal Regulations, Section 410.32(a) provided, "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

22.    Because CGx testing did not diagnose cancer, Medicare only covered such tests in limited circumstances, such as when a beneficiary had cancer and the beneficiary's treating physician deemed such testing necessary for the beneficiary's treatment of that cancer. Medicare did not cover CGx testing for beneficiaries who did not have cancer or lacked symptoms of cancer.

23.    In submitting claims to Medicare and Medicare Advantage Plans, providers used a variety of CPT codes to indicate CGx testing had been performed, including CPT code 81201—gene analysis (adenomatous polyposis coli), full gene sequence, and CPT code 81317—gene analysis (postmeiotic segregation increased 2 [S cerevisiae]) full sequence analysis.

**Telemedicine**

24.    Telemedicine provided a means of connecting patients to doctors and other medical professionals ("licensed provider") by using telecommunications technology, such as the internet or telephone.

25.    Medicare deemed telemedicine an appropriate means to provide certain health care related services ("telehealth services") to beneficiaries, including, among other services, consultations and office visits, only when certain requirements were met.  These requirements included, among others: (a) that the beneficiary was located in a rural area (outside a Metropolitan Statistical Area or in a rural health professional shortage area); (b) that the services were delivered via an interactive audio and video telecommunications system; and (c) that the beneficiary was at a licensed provider's office or a specified medical facility—not at a beneficiary's home—during the telehealth service furnished by a remote provider.

26.    Telehealth services could be covered by and reimbursable under Medicare, but only if telemedicine was generally appropriate, as outlined above, and only if the services were both ordered by a licensed provider and were reasonable and medically necessary to diagnose and treat a covered illness or condition.

27.    Legitimate telemedicine companies employed licensed providers to furnish telehealth services, including consultations, to individuals, often paying salaries to these employees. Telemedicine companies, typically, in turn, submitted claims to Medicare for telehealth services provided by employees to beneficiaries.

**The Defendants and Relevant Entities**

28.    Acadian Diagnostic Laboratories, LLC ("Acadian") was a Louisiana limited liability company with its principal place of business at 11842 Justice Avenue, Baton Rouge,

Louisiana, within the Middle District of Louisiana.  Acadian was a laboratory that purported to provide diagnostic laboratory services, including CGx testing.  Acadian applied for and was enrolled as a Medicare provider.  Acadian held an account, ending in 9458, at Regions Bank, in Baton Rouge, Louisiana.

29.     Defendant **KEVIN BERNARD HANLEY ("HANLEY")**, a resident of Prairieville, Louisiana, was the Chief Financial Officer of Acadian.

30.     Archer Diagnostics, LLC ("Archer"), a South Carolina limited liability company with its principal place of business at 300B American Legion Road, Greer, South Carolina, was a purported marketing company that identified and solicited beneficiaries to receive CGx testing and provided CGx tests to laboratories.  Archer held an account ending in 9750 at Grand South Bank in Greer, South Carolina.

31.     Defendant **MARK THOMAS ALLEN ("ALLEN")** was a resident of South Carolina.  **ALLEN** owned, operated, and/or controlled Archer.

32.     JL Management, LLC ("JL"), a Wyoming limited liability company registered with an address at 30 N. Gould Street, Sheridan Wyoming, was a purported medical billing company.  **ALLEN** and Co-Conspirator 1 owned, operated, and/or controlled JL.

33.     Laboratory A, a Louisiana limited liability company, purported to provide diagnostic laboratory services, including CGx testing.  Laboratory A was owned, operated, and/or controlled by Co-Conspirator 2.

34.     Laboratory B, a Delaware limited liability company, purported to provide diagnostic laboratory services, including CGx testing.  Laboratory B was owned, operated, and/or controlled by Co-Conspirator 3.

35.    Laboratory C, an Oklahoma limited liability company, purported to provide diagnostic laboratory services, including CGx testing.  Laboratory C was owned, operated, and/or controlled by Co-Conspirator 3.

36.    Laboratory D, a Florida limited liability company that merged with a Georgia limited liability company in 2018, purported to provide diagnostic laboratory services, including CGx testing.  Laboratory D was owned, operated, and/or controlled by Co-Conspirator 3.

37.    Company 1, a Florida limited liability company, was a purported marketing company that identified and solicited beneficiaries to receive CGx testing.  Co-Conspirator 1 owned, operated, and/or controlled Company 1.

38.    Company 2, a Florida limited liability company, was a purported telemedicine company that arranged with telemedicine providers to provide telehealth services.  Co-Conspirator 1 owned, operated, and/or controlled Company 2.

## THE FRAUDULENT SCHEME

### Overview

39.    **ALLEN** and his co-conspirators, through Archer, Company 1, and other companies, used a variety of marketing methods to target and solicit beneficiaries to receive CGx testing regardless of whether the beneficiaries were being treated for cancer or symptoms of cancer.  Upon obtaining beneficiaries' agreement to testing, **ALLEN** and his co-conspirators, through Company 1 and Company 2, paid kickbacks and bribes to telemedicine companies and telemedicine providers to obtain orders authorizing CGx testing that was medically unnecessasry and not reimbursable by Medicare, irrespective of whether these telemedicine providers actually spoke with or evaluated the beneficiaries for whom CGx

testing was ordered ("false and fraudulent orders").  **ALLEN** and his co-conspirators, in

exchange for kickbacks and bribes, paid by **HANLEY** and others, sold the false and fraudulent

orders and DNA samples to diagnostic testing laboratories, including Acadian, Laboratory A,

Laboratory B, Laboratory C, and Laboratory D, whereupon the laboratories performed CGx

testing on the DNA samples and submitted false and fraudulent claims to Medicare and

Medicare Advantage Plans.  Between March 2018 and July 2019, Acadian and Laboratory A

submitted approximately $246 million in false and fraudulent claims based upon DNA samples

obtained through **ALLEN** and his co-conspirators, and were reimbursed approximately $48

million.

### Purpose of the Scheme and Artifice

40.    It was a purpose of the scheme and artifice for the defendants and their co-

conspirators to unlawfully enrich themselves and others by, among other things: (a) paying

and receiving kickbacks in exchange for the referral of beneficiaries, DNA samples and the

accompanying false and fraudulent orders for CGx testing to Acadian, Laboratory A,

Laboratory B, Laboratory C, and Laboratory D, without regard to whether the ordered CGx

testing was medically necessary or eligible for reimbursement; (b) paying kickbacks to

telemedicine companies in exchange for ordering and arranging for the ordering of CGx testing

for beneficiaries, without regard to whether the ordered CGx testing was medically necessary

or eligible for reimbursement; (c) submitting and causing the submission, via interstate wire

communication, of false and fraudulent claims to Medicare and Medicare Advantage Plans,

through Acadian, Laboratory A, Laboratory B, Laboratory C, and Laboratory D, for CGx

testing that was not medically necessary and not eligible for reimbursement; (d) concealing

the submission of false and fraudulent claims to Medicare and Medicare Advantage Plans; and

(e) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

### Manner and Means of the Scheme and Artifice

41.     The manner and means by which the defendants and their co-conspirators sought to accomplish the objects and purpose of the scheme and artifice included, among other things:

a.     **ALLEN** and co-conspirators, through Archer, Company 1, and others known and unknown to the Grand Jury, obtained access to thousands of beneficiaries by targeting them with telemarketing campaigns, internet advertisements, and health fairs, and inducing them to accept CGx tests regardless of medical necessity.

b.     **ALLEN** and co-conspirators, through Archer, Company 1, and others known and unknown to the Grand Jury, arranged for beneficiaries to provide DNA samples for CGx testing, and further arranged for the samples to be transmitted to diagnostic testing laboratories, including Acadian, Laboratory A, Laboratory B, Laboratory C, and Laboratory D.

c.     **ALLEN** and co-conspirators, through Company 1 and Company 2, and others known and unknown to the Grand Jury, obtained false and fraudulent orders for the CGx testing by paying licensed providers contracted with Company 2, and by paying other telemedicine companies that contracted with licensed providers, even though the licensed providers were not treating the beneficiaries for cancer or symptoms of cancer, did not use the test results in any treatment of the beneficiaries, and did not conduct a proper telemedicine visit or consultation, via telemedicine.

      d.    **ALLEN** and co-conspirators, through Company 1, Company 2, and others known and unknown to the Grand Jury, paid and caused the payment of illegal kickbacks and bribes to licensed providers in exchange for providing false and fraudulent orders for CGx testing.

      e.    **ALLEN** and co-conspirators, through Archer and JL, solicited and received illegal kickbacks and bribes from **HANLEY**, Co-Conspirator 2, Co-Conspirator 3, and others known and unknown to the Grand Jury, in exchange for false and fraudulent orders and DNA samples collected from beneficiaries that would be used to support false and fraudulent claims from Acadian, Laboratory A, Laboratory B, Laboratory C, and Laboratory D to Medicare and Medicare Advantage Plans for CGx testing.

      f.    **ALLEN**, **HANLEY**, and their co-conspirators, known and unknown to the Grand Jury, created sham contracts, invoices, and documentation that disguised the illegal kickbacks and bribes as payments from Acadian, Laboratory A, Laboratory B, Laboratory C, and Laboratory D to Archer and JL for marketing services. **HANLEY** agreed to pay **ALLEN** and his co-conspirators, known and unknown to the Grand Jury, out of the reimbursements paid to Acadian by Medicare and Medicare Advantage Plans, a flat fee of up to $1,000 per sample, and as much as 50% of the net remaining revenues after deductions for billing fees and cost of goods sold, in exchange for their recruitment and referral of Medicare beneficiaries, CGx tests, and doctor's orders to Acadian, regardless of whether the CGx tests were medically necessary or reimbursable by Medicare.

      g.    **ALLEN**, **HANLEY** and their co-conspirators, known and unknown to the Grand Jury, used email and other forms of communication to inform each other of the collection of samples, the false and fraudulent orders for testing, Medicare reimbursements,

and the payment of kickbacks and bribes, among other matters related to the scheme and artifice.

h.    **ALLEN** and co-conspirators, known and unknown to the Grand Jury, submitted and caused Acadian to submit false and fraudulent claims to Medicare and Medicare Advantage Plans, in at least the approximate amount of $127.4 million, via interstate wire communication.

i.    **ALLEN** and co-conspirators, known and unknown to the Grand Jury, submitted and caused Laboratory A to submit false and fraudulent claims to Medicare and Medicare Advantage Plans, in at least the approximate amount of $119.1 million, via interstate wire communication.

j.    As the result of these false and fraudulent claims, Medicare and Medicare Advantage Plans made payments to Acadian and Laboratory A in at least the approximate amount of $48 million.

k.    **ALLEN** and his co-conspirators, known and unknown to the Grand Jury, used the fraud proceeds received from Acadian and Laboratory A, Laboratory B, Laboratory C, and Laboratory D to benefit themselves and others, and to further the fraud.

### COUNT 1
### Conspiracy to Commit Health Care Fraud and Wire Fraud
### (18 U.S.C. § 1349)

42.    Paragraphs 1 through 38 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

43.    Beginning in or around January 2018, and continuing through in or around July 2019, the exact dates being unknown to the Grand Jury, in the Middle District of Louisiana, and elsewhere, the defendant,

14

**MARK THOMAS ALLEN,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with Co-Conspirator 1, Co-Conspirator 2, Co-Conspirator 3, and others known and unknown to the Grand Jury, to commit certain offenses against the United States, that is:

a.     to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare and Medicare Advantage Plans, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347; and

b.     to knowingly and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing the pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing the scheme and artifice, did knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

### **Purpose of the Conspiracy**

44.     It was a purpose of the conspiracy for the defendant and his co-conspirators to unlawfully enrich themselves and others, as described in paragraphs 39 and 40 of the Indictment, which are re-alleged and incorporated by reference as though fully set forth herein.

**Manner and Means of the Conspiracy**

45.    In furtherance of this conspiracy, and to accomplish its objects, the methods, manners, and means that were used are described in paragraph 41 of the Indictment, and incorporated by reference as though set forth fully herein.

All in violation of Title 18, United States Code, Section 1349.

**COUNTS 2-4**
**Health Care Fraud**
**(18 U.S.C. § 1347)**

**The Scheme and its Execution**

46.    Paragraphs 1 through 38 of the Indictment are re-alleged and incorporated by reference as through fully set forth herein.

47.    Beginning in or around January 2018, and continuing through in or around July 2019, in the Middle District of Louisiana, and elsewhere, the defendant,

**MARK THOMAS ALLEN,**

aided and abetted by others known and unknown to the Grand Jury, in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, a scheme or artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare and Medicare Advantage Plans, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money owned by, and under the custody and control of, said health care benefit programs.

48.    The scheme to defraud is more fully described in paragraphs 39 through 41 of the Indictment and is re-alleged and incorporated by reference as if fully set forth herein.

49.    On or about the dates specified below, in the Middle District of Louisiana, and

elsewhere, aided and abetted by others, and aiding and abetting others known and unknown to the Grand Jury, **ALLEN** submitted and caused the submission of false and fraudulent claims to Medicare and Medicare Advantage Plans for CGx testing that was not medically necessary and properly prescribed as required by law and by Medicare regulations, in an attempt to execute, and in execution of the scheme, as described in paragraph 45 of the Indictment, with each execution set forth below forming a separate count:

| COUNT | Beneficiary | Approx. Date of Claim Submission | Claim Number | First Genetic Test Listed in Claim; HCPCS Code | Approx. Amount Claimed (Total Billed) |
|---|---|---|---|---|---|
| 2 | W.M. | 5/22/18 | 531118142489890 | Gene analysis (postmeiotic segregation increased 2 [S cerevisiae]) full sequence analysis; 81317 | $19,768 |
| 3 | J.R. | 7/19/18 | 531118178305740 | Gene analysis (postmeiotic segregation increased 2 [S cerevisiae]) full sequence analysis; 81317 | $19,768 |
| 4 | M.B. | 6/10/19 | 531118242274170 | Gene analysis (adenomatous polyposis coli), full gene sequence; 81201 | $16,780 |

Each of the above is a violation of Title 18, United States Code, Sections 1347 and 2.

## COUNT 5
### Conspiracy to Defraud the United States
### and to Pay and Receive Health Care Kickbacks
### (18 U.S.C. § 371)

50.    Paragraphs 1 through 38 of the Indictment are re-alleged and incorporated by reference as through fully set forth herein.

51.    Beginning in or around March 2018, and continuing through in or around April 2019, in the Middle District of Louisiana, and elsewhere, the defendants,

### MARK THOMAS ALLEN,
### and
### KEVIN BERNARD HANLEY,

did willfully, that is with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate and agree with others, known and unknown to the Grand Jury,

a.    to defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of the HHS in its administration and oversight of Medicare, in violation of Title 18, United States Code, Section 371; and to commit certain offenses against the United States, that is

b.    to violate Title 42, United States Code, Section 1320a-7b(b)(1)(A), by knowingly and willfully soliciting and receiving remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by wire transfer, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare and Medicare Advantage Plans; and

c.    to violate Title 42, United States Code, Section 1320a-7b(b)(2)(A), by knowingly and willfully offering and paying any remuneration, including kickbacks and

bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by wire transfer, to a person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare and Medicare Advantage Plans.

### Purpose of the Conspiracy

52.    It was a purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves and others by: (a) soliciting, receiving, offering, and paying kickbacks and bribes in return for recruiting and referring beneficiaries to Acadian for CGx testing that was medically unnecessary and not eligible for reimbursement; and (b) submitting and causing the submission of false and fraudulent claims to Medicare and Medicare Advantage Plans for CGx testing that was medically unnecessary and not eligible for reimbursement that Acadian purported to provide to those beneficiaries.

### Manner and Means of the Conspiracy

53.    The manner and means by which the defendants and their co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things, the following:

a.    **HANLEY** falsely certified to Medicare that he, as well as Acadian, would comply with all Medicare rules and regulations, and federal laws, including that they would not knowingly present or cause to be presented a false and fraudulent claim for payment by Medicare and Medicare Advantage Plans, and that they would comply with the Anti-Kickback Statute.

b.      **ALLEN** and his co-conspirators, known and unknown to the Grand Jury, solicited and received kickbacks from **HANLEY** and Acadian, in exchange for recruiting and referring beneficiaries to Acadian, knowing that Acadian would bill Medicare and Medicare Advantage Plans for CGx testing purportedly provided to the recruited beneficiaries.

c.      **HANLEY**, through Acadian, offered and paid kickbacks to **ALLEN** and his co-conspirators, known and unknown to the Grand Jury, in exchange for the recruitment and referral of beneficiaries that **ALLEN** and his co-conspirators referred to Acadian.

d.      **HANLEY**, **ALLEN**, and their co-conspirators, known and unknown to the Grand Jury, caused Acadian to submit false and fraudulent claims to Medicare and Medicare Advantage Plans, in at least the approximate amount of $127.4 million, via interstate wire communication.

e.      As the result of these false and fraudulent claims, Medicare and Medicare Advantage Plans made payments to Acadian in at least the approximate amount of $21.3 million.

f.      **HANLEY**, **ALLEN**, and their co-conspirators used the fraud proceeds received from Acadian to benefit themselves and others, and to further the fraud.

### Overt Acts

54.      In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one co-conspirator committed and caused to be committed, in the Middle District of Louisiana, and elsewhere, at least one of the following overt acts, among others:

a.      On or about June 5, 2018, **ALLEN** sent an email to **HANLEY** and others stating, "[]/[]/Kevin, Can we have a brief call today to discuss the contract? Just wanted to make sure we were all on the same page and in agreement."

b.      On or about April 25, 2018, **HANLEY** sent **ALLEN** an email with the subject "CGx", and setting out two columns showing CGx reimbursement amounts and subtracted costs, including a payment of "1000", resulting in an amount indicated for "Lab". Below this, **HANLEY** wrote "Archer?"

c.      On or about April 25, 2018, **ALLEN** responded to **HANLEY**'s email referenced in paragraph 54(b), stating, "We need $1000 per test today to keep the wheels on, I think the total is $88K.  We'll pay 100% of those funds out to reps, we'll make our portion on the re-billed codes and the remainder collected."

d.      On or about April 26, 2018, **ALLEN** sent **HANLEY** an email with the subject "CGx", stating, "Gross reimbursement CGx $4100.00", and setting out various deductions for billing fee, cost of goods sold, shipping, and swabs.  The email then states, "Adjusted Gross to Lab: $3277.00" and "At 50% lab keeps $1638.50".

e.      On or about September 3, 2018, a co-conspirator sent **HANLEY** and **ALLEN** an email entitled "Archer Invoice Genetics", attaching an invoice and a spreadsheet showing information on beneficiaries, reimbursements, and deductions, including, for each reimbursement, $1,000 for "Rep" and a commission equal to 50% of the net reimbursement. The email stated, in part, "I want to keep the volume coming and grow this with you, not fight and struggle to pay a rep group $100,000 who brings in $500,000 gross to Acadian."

f.      On or about September 11, 2018, a co-conspirator sent **HANLEY** and **ALLEN** an email stating, "Kevin, Total amount due for reps $376,500.  If you could get the wire out today it would be incredibly helpful to get the heat off of us and not have volume be effected.  Thank you!"

21

g.    On or about September 11, 2018, **HANLEY** responded to the email referenced in paragraph 58(f), stating, "[] can and is wiring in the am."

h.    On or about October 8, 2018, a co-conspirator sent **HANLEY** and **ALLEN** an email entitled "Fwd: Brick and Mortar Inv 3", attaching an invoice and a spreadsheet showing information on beneficiaries, reimbursements, and deductions, and including, for each reimbursement, $1,000 for "Rep" and a commission equal to 50% of the net reimbursement. The invoice indicated payment was due to Archer in the amount of $71,000 for "Rep" and $76,612 for "Comm", for a total of $147,612.

i.    On or about October 19, 2018, a co-conspirator sent **HANLEY** and **ALLEN** an email entitled "9/16-9/30 Invoice", attaching an invoice indicating payment was due to Archer for "Rep Group 1" through "Rep Group 7", in the total amount of $532,200.

All in violation of Title 18, United States Code, Section 371.

### COUNTS 6-7
**Offer and Payment of Kickbacks and Bribes in
Connection with a Federal Health Care Program
(42 U.S.C. § 1320a-7b(b)(2))**

55.    Paragraphs 1 through 38 and 52 through 54 of the Indictment are re-alleged and incorporated by reference as through fully set forth herein.

56.    On or about the dates set forth below, with respect to each count, in the Middle District of Louisiana, and elsewhere, the defendant, **KEVIN BERNARD HANLEY**, did knowingly and willfully offer and pay remuneration, that is, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by check, as set forth below, to a person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole

22

and in part under a Federal health care program, that is, Medicare and Medicare Advantage Plans; and to purchase, lease, order, and arrange for and recommend purchasing, leasing, and ordering any good, facility, service and item for which payment may be made in whole and in part under a Federal health care program, that is, Medicare and Medicare Advantage Plans, as set forth below:

| COUNT | Approximate Date Of Payment | Approximate Amount | Description |
|-------|------------------------------|--------------------|-------------|
| 6 | 9/12/2018 | $376,000 | Wire transfer from Acadian bank account ending in 9458 to Archer bank account ending in 9750 |
| 7 | 10/11/2018 | $147,612 | Wire transfer from Acadian bank account ending in 9458 to Archer bank account ending in 9750 |

Each of the above is a violation of Title 42, United States Code, Section 1320a-7b(b)(2) and Title 18, United States Code, Section 2.

**COUNTS 8-9**
**Solicitation and Receipt of Kickbacks and Bribes**
**in Connection with a Federal Health Care Program**
**(42 U.S.C. § 1320a-7b(b)(1))**

57.     Paragraphs 1 through 38 and 52 through 54 of the Indictment are re-alleged and incorporated by reference as through fully set forth herein.

58.     On or about the dates set forth below, with respect to each count, in the Middle District of Louisiana, and elsewhere, the defendant, **MARK THOMAS ALLEN**, did knowingly and willfully solicit and receive remuneration, specifically kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by check, as set forth below, in return for referring an individual to a person for the furnishing and arranging

for the furnishing of any item and service for which payment may be made in whole and in part under a Federal health care program, that is, Medicare and Medicare Advantage Plans; and in return for purchasing, leasing, ordering, and arranging for and recommending purchasing, leasing, and ordering any good, facility, service and item for which payment can be made in whole and in part under a Federal health care program, that is, Medicare and Medicare Advantage Plans, as set forth below:

| COUNT | Approximate Date Of Payment | Approximate Amount | Description |
|---|---|---|---|
| 8 | 9/12/2018 | $376,000 | Wire transfer from Acadian bank account ending in 9458 to Archer bank account ending in 9750 |
| 9 | 10/11/2018 | $147,612 | Wire transfer from Acadian bank account ending in 9458 to Archer bank account ending in 9750 |

Each of the above is a violation of Title 42, United States Code, Section 1320a-7b(b)(1) and Title 18, United States Code, Section 2.

## FORFEITURE ALLEGATIONS

59.     Upon conviction of any of the offenses set forth above, the defendants, **MARK THOMAS ALLEN** and **KEVIN BERNARD HANLEY**, shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), all property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the violations including, but not limited to, gross proceeds of the offenses held in Regions Bank Account Number ******9458 in the name of Acadian Diagnostic Laboratories, LLC. Furthermore, the

United States intends to seek a forfeiture money judgment equal to the amount of such gross proceeds if these proceeds are not available.

60.    If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

        a.    cannot be located upon the exercise of due diligence;

        b.    has been transferred or sold to, or deposited with, a third party;

        c.    has been placed beyond the jurisdiction of the court;

        d.    has been substantially diminished in value; or

        e.    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p) as incorporated by 18 U.S.C. § 982(b), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described above.

UNITED STATES OF AMERICA, by

BRANDON J. FREMIN
UNITED STATES ATTORNEY

KRISTEN L. CRAIG
ASSISTANT UNITED STATES ATTORNEY

GARY A. WINTERS
JUSTIN M. WOODARD
TRIAL ATTORNEYS
CRIMINAL DIVISION, FRAUD SECTION
UNITED STATES DEPARTMENT OF JUSTICE

A TRUE BILL

**REDACTED
PER PRIVACY ACT**

GRAND JURY FOREPERSON

9-26-19

DATE

**Criminal Cover Sheet**                    **U.S. District Court**

**Place of Offense:**                        **Matter to be sealed:**  X No ☐ Yes

City          Baton Rouge                    **Related Case Information:**

County/Parish   East Baton Rouge Parish      Superseding Indictment _____ Docket Number _____
                                             Same Defendant _____    New Defendant ____X____
        Agent: Wes Root-HHS-OIG              Magistrate Case Number _____
                                             Search Warrant Case No. _____
                                             R 20/ R 40 from District of _____
                                             **Any Other Related Cases:** _____

**Defendant Information:**

Defendant Name     Mark Thomas Allen

**U.S. Attorney Information:**

AUSA  Kristen L. Craig                       Bar #   LBN 32565

**Interpreter:**☐ No      ☐Yes      **List language and/or dialect:** _____
**Location Status:**

Arrest Date     _____
_____     Already in Federal Custody as of
_____     Already in State Custody
_____     On Pretrial Release

**U.S.C. Citations:**

Total # of Counts:      7

| Index Key/Code | Description of Offense Charged | Count(s) | Petty/ Misdemeanor/ Felony |
|---|---|---|---|
| 18:1349 | Conspiracy to Commit Health Care Fraud | 1 | F |
| 18:1347 | Health Care Fraud | 2-4 | F |
| 18:371 | Conspiracy to Defraud the U.S. and to Pay & Receive Health Care Kickbacks | 5 | F |
| 42:1320a-7b(b)(1) | Solicitation & Receipt of Kickbacks & Bribes in Connection With a Federal Health Care Program | 8-9 | F |

(May be continued on second sheet)

**Date:** _9/26/19_     **Signature of AUSA:** _KCraig_

**District Court Case Number (To be filled in by deputy clerk):** _____

**Criminal Cover Sheet**                                        **U.S. District Court**

**Place of Offense:**                        **Matter to be sealed:**  X No  ☐ Yes

City          Baton Rouge                    **Related Case Information:**

County/Parish    East Baton Rouge Parish     Superseding Indictment _____ Docket Number _____
                                             Same Defendant _____        New Defendant ____X____
              Agent: Wes Root-HHS-OIG        Magistrate Case Number _____
                                             Search Warrant Case No. _____
                                             R 20/ R 40 from District of _____
                                             **Any Other Related Cases:** _____

**Defendant Information:**

Defendant Name      Kevin Bernard Hanley

**U.S. Attorney Information:**

AUSA  Kristen L. Craig                              Bar #    LBN 32565

**Interpreter:**☐ No      ☐Yes      **List language and/or dialect:** _____
**Location Status:**

Arrest Date    _____
_____    Already in Federal Custody as of
_____    Already in State Custody
_____    On Pretrial Release

**U.S.C. Citations:**

Total # of Counts:     ___3___

| Index Key/Code | Description of Offense Charged | Count(s) | Petty/ Misdemeanor/ Felony |
|---|---|---|---|
| 18:371 | Conspiracy to Defraud the U.S. and to Pay & Receive Health Care Kickbacks | 5 | F |
| 42:1320a-7b(b)(2) | Offer & Payment of Kickbacks & Bribes in Connection with a Federal Health Care Program | 6-7 | F |

(May be continued on second sheet)

**Date:**  9/26/19          **Signature of AUSA:** K Cr_____

**District Court Case Number (To be filled in by deputy clerk):** _____